IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

BIRGITT EYSSELINCK,                    §
INDIVIDUALLY and as NEXT               §
FRIEND OF TE AND NU, MINORS            §
AND TIMOTHY A. EYSSELINCK,              §
DECEASED                               §
          Petitioner,                  §
                                       §
V.                                     §      CIVIL ACTION NO. H-07-4589
                                       §
DIRECTOR, OFFICE OF WORKERS'           §
COMPENSATION PROGRAMS, U.S.            §
DEPARTMENT OF LABOR, *et at*,          §
                                       §
          Respondents.                 §

**MEMORANDUM AND RECOMMENDATION DENYING PETITIONER'S
REQUEST FOR REVIEW AND AFFIRMING
DECISION OF THE BENEFITS REVIEW BOARD**

Before the Magistrate Judge upon referral from the District Judge is Petitioner Birgitt

Eysselinck's Petition for Review of the Decision of the Benefit Review Board ("BRB" or "Board")

denying Petitioner's claim for death benefits under the Longshore and Harbor Workers'

Compensation Act, 33 U.S.C. § 901 *et. seq.,* and its extension, the Defense Base Act, 42 U.S.C.

§ 165 *et. seq.* (Document No. 15), Respondent's Response to Petitioner's Brief in Support of Petition

for Review (Document No. 16), and Petitioner's Reply to Respondent's Brief in Opposition

(Document No. 17).  After considering the respective Briefs, the administrative record, which

includes the Fifth Circuit Appeal Record, Second Circuit Appeal Record and administrative record,

and the applicable law, the Magistrate Judge RECOMMENDS, for the reasons set forth below, that

Petitioner Birgitt Eysselinck's Petition for Review of the Decision of the Benefit Review Board

denying Petitioner's claim for death benefits under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et. seq.,* and its extension, the Defense Base Act, 42 U.S.C. § 165 *et. seq.* (Document No. 15) be DENIED, and that the decision of the Benefits Review Board be AFFIRMED.

## I. Introduction

Petitioner Birgitt Eysselinck, the widow of decedent, Timothy A. Eysselinck ("Decedent"), seeks judicial review of a denial of her claim for death benefits pursuant to the provisions of the Longshore and Harbor Workers' Compensation Act, as amended, 33 U.S.C. § 901 *et seq.*, and as extended by the Defense Base Act, 42 U.S.C. § 1651 *et. seq.* by the Benefits Review Board ("Board") on January 30, 2007. In that decision, the Board affirmed the February 8, 2006, decision of Administrative Law Judge Clement J. Kennington ("ALJ"), denying Petitioner's death benefit claim based on § 903(c) of the Longshore and Harbor Workers' Compensation Act. Petitioner argues that substantial evidence does not support the Board's decision, and that both the Board and the ALJ committed errors of law when determining that Decedent was not entitled to benefits because his death was by suicide. Petitioner contends that her husband's suicide was not a willful act as defined under Section 903(c), and therefore, she is entitled to benefits. According to Petitioner, her husband's suicide was the result of a mental condition, namely, post traumatic stress disorder ("PTSD"),[1] which caused the impulse to end his life. Petitioner argues that the evidence presented

---

[1] According to Medline Plus, a service of the U.S. National Library of Medicine and the National Institutes of heath, "[p]ost-traumatic stress disorder is a type of anxiety disorder. It can occur after you've seen or experienced a traumatic event that involved the threat of injury or death. Post-traumatic stress disorder may occur soon after a major trauma, or it can be delayed for more than 6 months after the event. When it occurs soon after the trauma, it usually gets better after 3 months. However, some people have a longer-term form of PTSD, which can last for many years." MedlinePlus, http://www.nlm.nih.gov. Symptoms of PTSD fall into three main categories. The first

to the ALJ shows that her husband did not have a willful intent to kill himself but that his suicide was a consequence of his work performing security services and de-mining activities in Iraq and other dangerous places, such as Namibia and Ethiopia, in connection with his employment by Force 21 and later Ronco Consulting Corporation ("RONCO") and that this condition was not diagnosed and treated prior to his suicide.   In support of this contention, Petitioner points to her husband's character and fitness as shown through email correspondence and testimony proffered by friends and family by way of deposition and hearing testimony, which cumulatively show Decedent and his wife had a happy marriage and that overall Decedent did not have the psychological make-up, to suggest he was willfully inclined to take his own life.  Petitioner further contends that the ALJ erred in his assessment of the medical expert testimony.  According to Petitioner, the ALJ overlooked or did not give sufficient weight to Dr. Seiberhagen's testimony and gave too much weight to that of Dr. Brodsky.  Petitioner contends that  because of the relatively short period of time, two months, between the time Decedent left Iraq and his suicide, and the absence of any other events that would trigger such an impulsive action by Decedent, that the only plausible and viable diagnosis was PTSD. According to Petitioner, the record is replete with examples of favorable evidence that she alleges was

---

is repeated reliving of the event, which disturbs day-to-day activity, which often includes flashback episodes, where the event seems to be happening again and again, recurrent distressing memories of the event, repeated dreams of the event, and physical reactions to situations reminiscent of the traumatic event.  The second is avoidance.  Symptoms include emotional "numbing" or feeling as though you don't care about anything, feelings of detachment, inability to remember important aspects of the trauma, lack of interest in normal activities, less expression of moods, staying away from places, people, or objects that remind you of the event, and a sense of having no future.  The third symptom is arousal. This includes difficulty concentrating, exaggerated response to things that startle you, excess awareness, irritability or outbursts of anger, and sleeping difficulties.  Other symptoms include a feeling of guilt about the event, and symptoms of agitation or excitability, dizziness, fainting, heart palpitations, fever, headache and paleness.  There are no tests to definitively diagnose PTSD. *Id.*

improperly rejected or overlooked by the ALJ, including, (1) the loss of a leg by one of his men in a mine explosion; (2)  an ambush of two civilian contractors in their Jeep;(3) sounds of bombs and mortar shells exploding and heard by others with whom Decedent had been conversing over the telephone; (4) concerns about attacks in the Green zone and on the Red Cross;  (5) shots being fired at Decedent's team members on or about December 16, 2003; (6) in November 2003, reports of death threats made to team members and shots fired at the same; (7) pressure at performing battle field clearance and being in the presence of live ordinances; (8) the receipt of a threat update reporting attacks on civilian aircraft; (9) reports of death threats to his team; (10) reports of a December 2003 attack with a security stand down; (11) reports of attacks on civilians and an inability to get outside security; (12) Decedent having to wear armor and carry side arms even though he was a civilian; (13) Decedent was driven off the road by another vehicle; (14)  dangerous situations were all around him in Iraq; and  (15) Decedent's harrowing last flight out of Iraq that made him believe that the aircraft was under fire when the plane fired off protective flares.  Petitioner maintains that the cumulative impact of the above described events, all of which occurred in the course of her husband's employment, triggered PTSD, which was undiagnosed and untreated prior to her husband's suicide.  Petitioner maintains that because Decedent had much to live for, namely, a loving relationship with his immediate family, his actions, months, weeks, days, and minutes, before his death, where out of character, and in retrospect show that he was experiencing well established symptoms of PTSD.  According to Petitioner, an individual such as Decedent, with PTSD, who has experienced, witnessed or is confronted with events that involve actual or threatened death or physical injury, often responds to such events with intense fear, helplessness or horror, and often recounts the experience to others.  Here, Petitioner contends the ALJ improperly discounted

4

Decedent's repeated recitations of the events described above in Iraq, namely, that his co-workers were threatened, he had to wear armor and carry a weapon as a civilian, and his recollections about his last flight out of Iraq.  In addition, when Decedent returned home on his furlough from RONCO, and awaiting a new assignment, he avoided discussions about Iraq, had trouble sleeping, had difficulty concentrating, and was detached and estranged from others he previously had been close to.  Finally, Petitioner contends that Decedent's personality and attitude changed after he returned from Iraq as evidenced by the Decedent avoiding eye contact during a routine medical exam on February 23, 2004. This had not been true a year earlier at his January 16, 2003, examination.  This behavior, avoiding eye contact, shows that Decedent had PTSD.

According to Petitioner, the ALJ erred by giving more weight to the testimony of Dr. Brodsky, who opined that Decedent's death was a suicide that was caused by a series of events including but not limited to a lawsuit over a motor vehicle he lost, his inability to track an animal that he had shot during a hunting trip, the failure of a delivery of a custom rifle, an argument with his spouse concerning his stepson going to a party, and remarks made about the stepson during the heat of the conversation.  Petitioner argues that Dr. Brodsky relied on events that were minor and would not, in and of themselves, have caused Decedent to take his own life, and more important, that Dr. Brodsky failed to recognize that PTSD has a delayed onset. Moreover, even assuming that Decedent did not have PTSD, Petitioner maintains that the record clearly suggests that he had depression that was also caused by his employment, and that this condition (depression) should have been considered as a cause for Decedent's suicide and that because it was not, the matter should be remanded for further development of the record.

In response, Respondents contend that the Board did not commit an error of law in affirming the ALJ's order denying benefits to Petitioner because the ALJ's decision was rational, based on substantial evidence, and was in accordance with the applicable law.  According to Respondent, Decedent had the willful intent to end his life and his suicide was not attributable to an employment related condition.  Respondent contends that Petitioner, through the instant appeal, re-urges the same arguments previously considered and rejected by the Board, namely, that the ALJ erred in assessing and weighing the evidence.  According to Respondent, the Board properly decided  that there was no evidence supporting Petitioner's claim that Decedent's suicide was an "irresistible impulse" caused by an employment related condition (PTSD).  Respondent contends that the ALJ considered and summarized the evidence in great detail and, that given the ALJ's thorough review and summary of the record,  the inferences drawn by the ALJ were neither unreasonable nor were the findings inconsistent with the record.  Respondent further maintains that the Board engaged in a careful review of the ALJ's decision and found that it was lawful, rational, and based on substantial evidence. The Board rejected claimant's contentions that the ALJ erred in crediting the testimony of Dr. Brodsky over the testimony of Dr. Sieberhagen.

## II. Administrative Proceedings

Here, Petitioner, Birgitt Eysselinck, is the widow of decedent Timothy A. Eysselinck.  She brings the instant action on her behalf and on behalf of the two minor children of the Decedent against Ronco Consulting Corp, and its insurance carrier, Fidelity & Casualty Company of New York.  The ALJ held a hearing on May 10 and 11, 2005, in Houston, Texas at which Petitioner and the decedent's mother, Janet Burroway, testified.  In addition, the parties were allowed to submit documentary evidence, including depositions and witness statements, and to submit post hearing

briefing.  Both sides did so and the ALJ carefully and thoroughly summarized the exhibits and testimony in his decision.  The ALJ heard testimony from competing experts, who each made a retrospective diagnosis based on their review of the applicable records and witness interviews. Neither had personally interviewed Decedent and there were no contemporaneous medical treatment notes or records by a mental health care professional.

The appeal in the instant action involves the ALJ's rejection of Petitioner's contention that decedent suffered from PTSD due to the stress of his job in Iraq, which culminated in his suicide and as such, his death was job related and his family is entitled to compensation under the Act. The ALJ concluded that because Decedent had not suffered from a work related psychological or psychiatric impairment, and because his suicide was not caused or produced by a psychological or psychiatric impairment, Petitioner was not entitled to benefits.  The ALJ wrote:

> This case involves the tragic suicide of Timothy A. Eysselinck (decedent).  Although the record contains voluminous exhibits and testimony from over 16 witnesses, many of the facts concerning decedent are uncontested and reflect a person of the high moral character much loved by family, friends, and co-workers.
>
> Decedent was born in Gant, Belgium and lived abroad until age 8 when he came to the United States where he was educated.  Decedent was raised by his mother, an English professor who taught at the University of Illinois and Florida State University. Decedent graduated with a degree in history from the University of Florida.  While at the University of Florida, Claimant took ROTC and upon graduation went into the U.S. Army on active duty serving 4 years at various stateside bases.  Upon leaving the Army claimant was employed by Wackenhut providing security services at the U.S. Embassy in Cameroon after which he joined the Army Reserves and was deployed to Stuttgart, Germany, Bosnia, Congo and then Namibia. (Tr. 176, 177; RX-20, pp. 11, 12, 14, 18, 22, 23).
>
> Decedent had a life long fascination with guns and the military and was an avid gun collector and hunter.  Despite years of military service he never saw combat.  (Tr. 120-124; RX-20, pp. 40-42).  He was patriotic, a perfectionist, polite and "fiercely honorable" about following rules especially those related to hunting and inter personal relationships.  (Tr. 50, 153, 178-180; RX-20 pp. 44-50).  Decedent's last tour of

Army duty was at the U.S. Embassy in Windhoeck, Namibia from March through September 1998, where he served as a liaison officer coordinating services for a de-mining project funded by the U.S. wherein the Namibian Defense Force cleared mines from power pylons.  During this tour in April, 1998, decedent met Claimant.  They married on December 31, 1999.  Decedent was a loyal and devoted husband and father drawing no distinction between his stepson (Neal Uys) and natural daughter (Thyra Jessica).  (Tr. 182, 187, 188, CX-19, 23, 37, 48, 63, 89, 105, 102, 159).

When married Decedent was working for Force 21, a company owned and operated by Will Haynes, and engaged in de-mining operations with Namibian Defense Forces in northern Namibia.  Decedent was a duty task leader responsible for administration, finances, general project management and training.  In February, 2001, Employer replaced Force 21 but retained Decedent to continue this work until March, 2001, when Employer reassigned him to Addis Ababa as Chief of Party responsible for overall administration of de-mining operations.  Claimant remained in that position until July, 2003, when reassigned to Baghdad, Iraq.  (Tr. 28-31, 34-36, 40, 48, 49; CS-11, 12, 137; RX-20, p. 46).

Decedent arrived in Baghdad in August, 2003, while Claimant and their children remained in Windhoek, Namibia.  In Baghdad decedent worked and lived in a secure area known as the Green Zone.  Decedent was designated task leader responsible for the overall administration and training of Iraqi personnel who performed the actual physical de-mining task which included battle field area clearance,(BAC) i.e., the defusing or rendering inoperable unexploded ordinance such as cluster bombs and IEDs (improvised explosive devices).  Decedent did this work until shortly before Christmas when he took a two week leave to return to Windhoek and attend a company meeting in Florida.  (RX-20, p. 32).  Decedent returned to Baghdad in January, 2004, and remained there until February 21, 2004, when in agreement with Employer he took a 3 month leave of absence and returned to Windhoek where he lived until April 23, 2004, on which day he committed suicide.  (RX-20, pp. 31, 51; CS-104, 108, 152).  Decedent was respected by fellow workers and trainees.  (CX-101, 106, 107, 149, 158).  In turn he cared for, was concerned about and proud of those with whom he worked.  (Tr. 53-55, 134, 191; CX-160).  (p4-5)

The ALJ summarized the testimony of the two experts as follows:

Both physicians appear to be well qualified board certified psychiatrists.  Dr. Sieberhagen has practiced general psychiatry since 1998, receiving his initial medical degree in 1983 followed by a general practice until 1992 after which he returned to medical school completing a 4 year speciality course in psychiatry.  (RX-21, pp. 1-12).  Dr. Sieberehagen has treated many persons with post-traumatic stress disorder caused by the war between Namibia and southern Angola.  (Id. at 28).

Dr. Brodsky received his initial medical license in 1957 after graduating from the University of California San Francisco, became board certified in psychiatry in 1964, and professor of psychiatry at the University of California maintaining a clinical practice in psychiatry treating or examining hundreds of persons suffering with post-traumatic stress disorder as well as other psychiatric conditions.  (RX-24, pp. 1-13).

Dr. Sieberhagen treated Claimant and Ms. Sielle helping both ladies with Decedent's suicide.  Dr. Sieberehagen did not have the opportunity to see Decedent but based upon his interviews and review of materials provided by Claimant was able to conclude that Decedent was a happy man up to the time he took his life. (Id. at 19, 20).  Dr. Sieberhagen testified that Decedent was a sociable and well liked person. He was very happy with his marriage to Claimant and their daughter.  Decedent was supportive and assertive toward his stepson developing a trusting relationship with him. (Id. at 22).  Before rendering a psychiatric opinion about Decedent's mental problems, Dr. Sieberhagen stated that the mainstay of a diagnosis of post-traumatic stress disorder (PTSD) is an examination of the patient which he was not able to do. However, from information supplied post-mortem and looking for an explanation for the suicide, the only possible explanation he could come up with was PTSD.  (Id. at 23, 24).

Regarding his diagnosis of PTSD, Dr. Sieberhagen testified as follows:

Post-trauma stress disorder as a clinical entity has been well described, and its association with the circumstances under which Mr. Eysselinck worked over the past years has been well documented.  And my argument would be that given the circumstances under which he worked and in the sequelae of events after him coming back from the war zone which ended in a suicide is so typical of what is described in many, many different journals that one cannot ignore this as a real possibility that this person suffered from post-traumtic stress disorder or some similar impairment. (Id. at 26, II. 4-16).

Dr. Sieberhagen stated the he could not come up with a better explanation why Decedent committed suicide, and thus, concluded that PTSD must have been the cause by a process of elimination of other possibilities. (Id. at 84).  Dr. Sieberhagen testified that PTSD symptoms include flashbacks (reliving experiences such as intrusive thoughts, nightmares, or hallucinations or illusionary visions), avoidance of situations related to the trauma; hyper-arousal or hyper-vigilance. (Id. at 29, 30).  Dr. Sieberhagen assumed Decedent regarded his situation in Iraq as dangerous because of correspondence from Pete Owen to Decedent dated October 17, 2003 referring to an alleged constant threat of attack and a message from Mike Hartling about employees carrying weapons and a letter from Decedent on May 19, 2003, describing an incident in Ethiopia where a person was injured stepping on a mine. (Id. at 34). Dr. Seiberhagen then referred to other documents, wherein Decedent referred to one

9

of his men being injured by a mine in Ethiopia, increased attacks on contractors in Iraq, threats received by trainees, shots fired at staff, fights between staff and Iraqis, security being a concern as security manager for Employer arrived.  In all, Dr. Sieberhagen referred to 17 documents in show support (sic) for criterion A, PTSD, Section 309, 81 of the DSM-IV.  (Id. at 47-48)

Dr. Sieberhagen found Decedent to be easily amused and anxious receiving little support for the U.S. war effort in Iraq, and a perfectionist, all of which impacted on the development of PTSD as found in The Comprehensive Textbook for Psychiatry by Kaplan & Sadock, 6th Eidtion.  (Id. at 54).  Decedent was very sensitive to noise a characteristic of PTSD as was his sense of learned helplessness as witnessed when leaving Iraq and the plane he was in shot off flames. (Id. at 60).  Dr. Sieberhagen admitted there was no evidence of intense fear, helplessness or horror or evidence of reliving experiences or flashbacks as required by Section A-2 and B for PTSD in the DSM-IV.  (Id. at 61-63).  Dr. Sieberhagen opined that during Decedent's last minutes he was unable to govern his own faculties and acted on an irresistible impulse.  (Id. at 106).

Dr. Sieberhagen further testified that he though[t] Decedent suffered from a number of low impact stressors and the airplane incident which resulted in intense fear to meet the Section A criterion with avoidance of Iraq meeting the C criterion, with repeated symptoms of increased arousal meeting the D criterion, with symptoms lasting more than a month and causing significant distress in social setting (conduct toward wife and children, throwing binoculars and driving recklessly meeting the E and F criterion for PTSD.  (Id. at 111-117).

In contrast to Dr. Sieberhagen, Dr. Brodsky testified that in diagnosing PTSD, he utilized the specific criteria established in the DSM-IV.  Additional[ly] he reviewed extensive material including Dr. Sieberhagen's deposition and medical report of June 16, 2004, hearing testimony, and post-hearing depositions.  The criterion include a highly traumatic event in which one's life is threatened or one sees someone else's life being threatened resulting in (1) an immediate, (2) intrusive, (3) heightened awareness, vigilance, alertness in re-experiencing the event in question with, and (4) attempts at avoidance of said event.  (RX-24, pp. 20, 21).  Dr. Brodsky found no discussion by Dr. Sieberhagen of an immediate impact or any explanation for why Decedent took his life except to say that Dr. Sieberhagen reasoned backward concluding that it must have been the airplane event and the dangers he had experienced over years because he could find no other explanation.  (Id. at 27, 28). Further, there was not evidence of avoidance and nothing different about Decedent's life until shortly before his suicide.  (Id. at 29).

Dr. Brodsky testified that suicide is a risk of depression and not PTSD with tables showing only a small percentage of suicides resulting from acute stress disorders as

opposed to depression. Further, there was no nexus between the airplane incident and the suicide. (Id. at 39). Based upon the following facts, Dr. Brodsky formulated a differential diagnosis of a frustrated individual who after consuming several glasses of wine shot himself due to a combination of factors: (1) a lawsuit which at that point in time he had lost, (2) no job offer, (3) some problems with his stepson, (4) non-receipt of gun, (5) more drinking than normal, (6) failure to properly shoot and kill an animal, (7) disagreement with wife over discipline of stepson and (8) being a perfectionist. (Id. at 42-45). Dr. Brodsky found no evidence of any irresistible impulse due to any mental disorder and no connection between the suicide and his work. (Id. at 46-49). On cross, Dr. Brodsky testified that Decedent's suicide was not incongruent with his personality (a man who collected guns) and had it not been for the stressors of the day, a loss of inhibition due to alcohol, Decedent probably would not have committed suicide. (Id. at 67).

With respect to the credibility of the witnesses, lay and expert, the ALJ wrote:

> It is well-settled that in arriving at a decision in this matter the finder of fact is entitled to determine the credibility of the witnesses, to weigh the evidence and draw his own inferences from it, and is not bound to accept the opinion or theory of any particular medical examiner. *Banks v. Chicago Grain Trimmers Association, Inc.,* 390 U.S. 459, 467 (1968); *Louisiana Insurance Guaranty Ass'n v. Bunol,* 211 F.3d 294, 297 (5th Cir. 2000); *Hall v. Consolidated Employment Systems, Inc.*, 139 F.3d 1025, 1032 (5th Cir. 1998); *Atlantic Marine Inc. v. Bruce,* 551 F.2d 898, 900 (5th Cor. 1981); *Arnold v. Nabors Offshore Drilling, Inc.*, 35 BRBS 9, 14 (2001). Any credibility determination must be rational, in accordance with the law and supported by substantial evidence based on the record as a whole. *Banks*, 390 U.S. at 467; *Mijangos v. Avondale Shipyards, Inc.*, 948 F.2d 941, 945 (5th Cir. 1991); *Huff v. Mike Fink Restaurant, Benson's Inc.*, 33 BRBS 179, 183 (1999).

> As mentioned previously, I was impressed by the sincerity and honesty of Claimant and Decedent's mother, Janet Burroway, but found that they were mistaken regard[ing] Decedent's work which did not involve actual de-mining or destruction of ordinance. Rather Decedent basically had a desk job and only went into the field on 4 occasions during which he was not exposed to live ordinance. Although Claimant introduced many exhibits wherein employees were occasionally shot at or threatened and contractors attacked Decedent was not exposed to life threatening or perceived life threatening incidents except arguably for Decedent's departure flight when the plane shot off protective flares. This was supported by credible testimony from Mr. Hartling, and Marshall and to a lesser extent Decedent who admitted the news exaggerated safety threats and true to his promise to Claimant left Baghdad before security deteriorated. There was moreover no evidence to suggest that Claimant was exposed to life threatening situations in either Ethiopa or Namibia, where Decedent had essentially an office or desk job.

11

Regarding expert witnesses Drs. Sieberhagen and Brodsky, I find as Dr. Brodsky noted, that Dr. Sieberhagen had no explanation for why Decedent committed suicide other than to engage in backward reasoning stating that it must be PTSD or some related disease because he could find no other cause.  Dr. Brodsky relied upon the DSM-IV and testified how the evidence failed to meet the DSM-IV criteria for PTSD as opposed to Dr. Sieberhagen who hinted at, but never, identified or explained how symptoms related to or demonstrated PTSD much less created an irresistible impulse to commit suicide.

The ALJ ultimately concluded:

In the present case, I am confronted with two different expert opinions in explaining the suicide.  Dr. Siebehagen would have me believe Decedent committed suicide because of PTSD related to working conditions while speculating that there must have been an irresistible impulse because of Decedent' irrational action.  On the other hand, Dr. Brodsky opines Claimant committed suicide because of a combination of non-work related stressors including extra alcohol consumption.  Of these two opinions, I find Dr. Brodsky's opinion to be more logical and persuasive.  That is not to say Decedent had a bad marriage or unusual problems dealing with his stepson.  Decedent was confronted with a combination of non-work related stressors and before waiting to have Claimant provide him with professional help made an irrational decision to end his life.  However, unfortunate and tragic Decedent's actions were, Employer is not responsible for such conduct.

According to the DSM-IV, to establish a diagnosis of PTSD, a claimant much show:

The essential feature of Posttraumatic Stress Disorder is the development of characteristic symptoms following exposure to an extreme traumatic stressor involving direct personal experience of an event that involves actual or threatened death or serious injury, or other threat to one's physical integrity; or witnessing an event that death, injury or a threat to the physical integrity of another person; or learning about unexpected or violent death, serious harm or threat of death or injury experienced by a family member or close associate (Criterion A 1).  The person's response to the event must involve intense fear, helplessness, or horror… (Criterion A 2).  The characteristic symptoms resulting from the exposure to the extreme trauma include persistent re-experiencing of the traumatic event (Criterion B); persistent avoidance of stimuli associated with the trauma and numbing of general responsiveness (Criterion C) and persistent symptoms of increased arousal (Criterion D).  The full symptom picture must be present for more than 1 month (Criterion E) and the disturbance must cause clinically significant distress or

impairment in social, occupational, or other important areas of functioning (Criterion F).  (Id. at 424).

The ALJ found it significant that while Dr. Sieberhagen testified that Decedent arguably met Criterion A there was no reliable evidence to show that he had an irresistible impulse, or assuming there was in irresistible impulse, that is was connected to either a mental impairment or work.  According to the ALJ: "[t]hat does not mean there was not some degree of danger with just being in Iraq.  However, general work stressors are not sufficient to cause PTSD let alone deprive Decedent of free will when he killed himself."

Petitioner then asked for a review by the Board of the ALJ's adverse decision.  After considering  Petitioner's contentions that the ALJ erred in his assessment of the evidence, in light of the applicable law and evidence, the Board on January 30, 2007, affirmed the ALJ's Decision and Order Denying Benefits.  In affirming the ALJ's decision, the Board wrote:

Claimant is the widow of the deceased employee, who died on April 23, 2004, of a self-inflicted gunshot would.  She filed a claim seeking death benefits from employer under 33 U. S. C. § 909.  Employer engages in de-mining operations around the world.  Decedent, claimant's husband, was initially employed by employer in Namibia as a duty task leader, with responsibilities which included administrative and finance work, general project management and training.  In March 2001, decedent was reassigned by employer to Ethiopia, where he was responsible for the overall administration of employer's de-mining operations in that country.  In July 2003, decedent was assigned to employer's operations in Iraq.  Upon arriving in Baghdad, Iraq, in August 2003, decedent lived and worked primarily in the "Green Zone" in that city.  While decedent's work in Iraq did not involve actual de-mining or the destruction of unexploded ordinance, decedent occasionally left the Green Zone to observe employer's workers who were in the field.  As the security situation in Iraq gradually began to deteriorate, decedent commenced wearing a bullet-proof vest and carrying a firearm.  Decision and Order at 6.

In December 2003, decedent left Iraq and returned to Namibia to visit his wife and children.  After attending a company conference in Florida on January 3, 2004, decedent returned to Iraq on January 7.  Employer subsequently approved decedent's request for a three-month leave of absence.  When leaving Iraq, decedent's plane was

13

required to ignite defensive flares. Decedent returned to Namibia on February 21, 2004.

Claimant testified that decedent experienced no readjustment problems upon his return to Namibia and his family until the last week in March 2004, when he became irritable, could not sleep and complained of being depressed. Decision and Order at 7; Tr. at 82-87). On the date of his death, April 23, 2004, claimant stated that decedent returned from a three-day hunting trip in an agitated state, complaining that he had shot an animal but had been unable to track it. Claimant stated decedent was in an "angry and aggressive" state, throwing a pair of binoculars against a table, complaining about his failure to receive a special order rifle and telling his wife he was concerned about employees in Iraq. Id.; Tr. 99-105. Later that day, a disagreement arose between claimant and decedent about allowing decedent's step-son to attend a local carnival. Decedent ultimately agreed to let his step-son attend, and he personally dropped him off at a friend's home that evening. Tr. at 106-110. After dinner that evening, claimant and decedent played cards, with decedent consuming two glasses of wine. After making a comment regarding claimant's need to get him professional help, a negative statement regarding his step-son which he immediately retracted, and a comment that he didn't want to be the bad man, decedent left the room, returned brandishing a pistol, and shot himself. Id; Tr. at 111-114. Claimant subsequently filed a claim for death benefits under Section 9 of the Act, 33 U.S.C. § 909, alleging that decedent's death was related to his employment with employer in Iraq.

In support of her claim for benefits under the Act, claimant relied upon the opinion of Dr. Sieberhagen, a Board-certified psychiatrist, who concluded that the only possible explanation for decedent's suicide was that decedent suffered from a post-traumatic stress disorder following his return from Iraq, and that decedent's suicide was the result of an impulsive act brought about by work-related causes. In rendering this opinion, Dr. Sieberhagen testified that, after eliminating other possibilities, he could not come up with a better explanation as to why decedent committed suicide. Specifically, after acknowledging the awkward situation of having to render a mental assessment without having ever examined the decedent, CX 147 at 23, Dr. Sieberhagen, stated that "the only answer that we can possibly come up with is that he may have suffered from a post-trauma stress disorder given the facts that we have before us." Id. at 24. However, Dr. Sieberhagen acknowledged that "the fact remains that we still don't have an answer as to why [decedent] killed himself." Id. at 83.

In response, employer presented the contrary opinion of Dr. Brodsky, who is also a Board-certified psychiatrist and who opined that decedent did not have a post-traumatic stress disorder upon his return from Iraq, and that there was no evidence of any relationship between decedent's employment with employer and his death.

Rather, Dr. Brodsky attributed decedent's suicide to the numerous non-work stressors that decedent experienced upon his return from Iraq in February 2003, including an ongoing lawsuit, uncertainty regarding his future employment, his relationship with his step-son, the non-receipt of a specially-ordered firearm, an unsuccessful hunting experience with a friend, and a disagreement with his wife on the day of his demise.  RX 24 at 42.  Dr. Brodsky concluded that there was no evidence of any relationship between decedent's employment with employer and his decision to take his own life on April 23, 2004.  Id. at 46-49.

In his Decision and Order, the administrative law judge credited the testimony of Dr. Brodsky, finding that this physician's opinion was more logical and persuasive then the opinion of Dr. Sieberhagen.  Consequently, the administrative law judge determined that as decedent, when confronted with a combination of non-work related stressors, made a decision to end his life, employer was not responsible for decedent's conduct and he accordingly denied the benefits sought by claimant.

On appeal, claimant contends that the administrative law judge erred in denying her claim for benefits under the Act.  Specifically, claimant challenges the administrative law judge's decision to credit the opinion of Dr. Brodsky over that of Dr. Sieberhagen when addressing the potential relationship between decedent's employment in Iraq and his death.  Employer responds, urging affirmance of the administrative law judge's decision in its entirety.

In denying benefits, the administrative law judge relied on Section 3(c), which states:

> No compensation shall be payable if the injury was occasioned ... by the willful intention of the employee to injure or kill himself or another.

33 U.S.C. § 903(c).  *See O'Connor v. Triple A Machine Shop*, 13 BRBS 473 (1981) (Miller, J., concurring in part and dissenting in part); *Kielczweski v. The Washington Post Co.,* 8 BRBS 428 (1978); *Rogers v. Dalton Steamship Corp.*, 7 BRBS 207 (1977).  Section 20(d) of the Act affords a claimant the benefit of the presumption "that the injury was not occasioned by the willful intention of the injured employee to injury or kill himself or another."  33 U.S.C. § 920(d).  *See Maddon v. Western Asbestos Co.*, 23 BRBS 55 (1989).  Where an employee's suicide is the result of an irresistible suicidal impulse due to a work-related condition, it is not due to "willful intent" on the part of the employee, and Section 3(c) does not bar the compensation claim.  *See Director, OWCP v. Potomac Elec. Power Co.*, 607 F.2d 1378, 10 BRBS 1048 (D.C. Cir. 1979) (work injury results in psychological problems, leading to suicide); *Voris v. Texas Employers Ins. Ass'n*, 190 F.2d 929 (5th Cir. 1951); *see also Terminal Shipping Co. v. Traynor*, 243 F.Supp. 915 (D.Md. 1965); *Konno v. Young Bros., Ltd.,* 28 BRBS 57 (1994).

15

Claimant asserts that the administrative law judge erred in evaluating the medical evidence of record regarding decedent's state of mind following his return to Namibia in February 2004, and in crediting the testimony of Dr. Brodsky over the testimony of Dr. Sieberhagen.   Specifically, claimant avers that decedent suffered from depression upon his return from Iraq, and that Dr. Brodsky's opinion relating decedent's death to multiple non-work stressors lacks credibility.   We reject claimant's contentions of error, as the administrative law judge rationally gave greater weight to the opinion of Dr. Brodsky that decedent's death was unrelated to his employment with employer but was, rather, upon his return from Iraq.   *See Todd Shipyards Corp. v. Donovan*, 300 F.2d 741 (5th Cir. 1962); *John W. McGrath Corp. v. Hughes,* 289 F.2d 403 (2nd Cor. 1961).   It is well-established that the administrative law judge as the trier of fact is entitled to evaluate the credibility of all witnesses and to draw his own inferences and conclusions from the evidence.   *See Calbeck v. Strachan Shipping Co.*, 306 F.2d 693 (5th Cir. 1962), *cert. denied*, 373 U.S.954 (1963).   The Board's scope of review under Section 21(b)(3)of the Act, 33 U.S.C. § 921(b)(3), is limited to determining whether there is substantial evidence to support the administrative law judge's decision.

In the instant case, the administrative law judge took extensive testimony regarding decedent's work and his activities prior to his death.   He stated specifically that he was impressed by the honesty and sincerity of claimant and decedent's mother, but found they were mistaken regarding the nature of decedent's work, which did not involve the actual destruction of ordinance but was a desk job.   He thus found, based on credible testimony, that claimant was not exposed to life threatening situations in Iraq.   He discussed at length the relevant medical opinions of Drs. Sieberhagen and Dr. Brodsky.   In weighing this evidence, the administrative law judge concluded that the opinion of Dr. Brodsky was more logical and persuasive than the contrary opinion of Dr. Sieberhagen, who engaged in "backward reasoning" in concluding decedent's suicide must have been caused by a post-traumatic stress disorder or another illness because he could find no other cause.   Decision and Order at 17.   In contrast, he stated that Dr. Brodsky relied on the DSM-IV and explained how the evidence failed to meet the criteria for a post-traumatic stress disorder.   Claimant's contentions on appeal essentially request that we re-weigh this evidence, which we are not empowered to do.   Consequently, as the credited medical opinion of Dr. Brodsky constitutes substantial evidence in support of the administrative law judge's conclusion that decedent's death was related to a variety of non-work stressors, we affirm the administrative law judge's denial of claimant's claim for death benefits under the Act.

Petitioner now has filed her appeal of the Board's decision.   Jurisdiction is proper before the

Court.   *AFIA/CIGNA World wide v. Felkner*, 930 F.2d 111 (5th Cir. 1991) (Defense Base Act cases

in the Fifth Circuit are to be appealed from the BRB to the District Courts where the appropriate location of the district director office is located.  42 U.S.C. 1653(b); *H.B. Zachary C. v. Quinones*, 206 F.3d 474 (5th Cir. 2000)).  Here, the location of the district director was Houston, Texas.  As such, jurisdiction lies in the Southern District of Texas, Houston Division.  Petitioner has filed an Appeal Brief (Document No. 15).  Defendant has responded to Petitioner's Brief.  (Document No. 16).  Petitioner replied to Defendants' Response.  (Document No. 17).  This appeal is now ripe for ruling.

The evidence is set forth in Administrative records, Second Circuit appeal record and the Fifth Circuit appeal record that was filed on November 5, 2007.

## III.  Discussion

Civilian contractor employees that are working overseas are entitled to workers' compensation benefits under the Longshore and Harbor Workers Compensation Act, 33 U.S.C.  § 901, *et. seq.*, and its extension, the Defense Base Act ("Act") , 42 U.S.C. § 1651, *et. seq*.  See 42 U.S.C. § 1651(c).  "[T]he [Defense Base Act] provides an employee's exclusive remedy if the employee was engaged in employment outside the United States under a contract between his employer and the United States for the purpose of engaging in public work, including contracts and projects in connection with national defense and war activities, where the employee suffered an injury within the course and scope of his employment."  *Fisher v. Halliburton*, 390 S.Supp. 2d 610 (S.D. Tex. 2005).  Under 33 U.S.C. § 903(c), "no compensation shall be payable if the injury was occasioned solely by the intoxication of the employee or by the willful intention of the employee to injure or kill himself or another."  The burden rests on the claimant seeking benefits to show the cause of the suicide was the result of an irresistible impulse to kill onself.  The Fifth Circuit Court of

17

Appeals has held that in order to show an irresistible impulse, the claimant must produce expert opinion that Decedent suffered from a mental disease or impairment which created the impulse leading to the suicide. *Voris v. Texas Employers Ins. Assoc.,* 190 F.2d 929, 931 (5th Cir. 1951), *cert. denied,* 342 U.S. 932 (1952).

When considering an appeal of an ALJ's order, the Board lacks statutory authority "'to engage in a de novo review of the evidence or to substitute its views for those of the ALJ.'" *Ceres Marine Terminal v. Dir., Office of Worker's Compensation*, 118 F.3d 387, 389 (5th Cir. 1997) (quoting *Mijangos v. Avondale Shipyards, Inc.*, 948 F.2d 941, 944 (5th Cir. 1991)). In particular, the Board must accept the ALJ's findings unless they '"are not supported by substantial evidence in the record considered as a whole or unless they are irrational.'" *Id.*. "'[W]e may not substitute [our] judgment for that of the ALJ, nor may we reweigh or reappraise the evidence, instead we inquire whether there was evidence supporting the ALJ's factual findings.'" *Louisiana Ins. Guar. Ass'n. v. Bunol*, 211 F.3d 294, 296 (5th Cir. 2000) (quoting *Boland Marine & Manufacturing Co. v. Rihner*, 41 F.3d 997, 1002 (5th Cir. 1995)); *Coastal Production Services, Inc. v. Hudson*, ___ F.3d___, 2009 WL 82367 (5th Cir. Jan 14, 2009). As to the Court's role in reviewing a decision of the Board, the Court is to independently review the record, and "'to [consider] errors of law and [make] certain that the [Board] adhered to its statutory standard of review of factual determinations, that is whether the ALJ's findings of fact are supported by substantial evidence and [are] consistent with the law.'" *Ortco Contractors, Inc. v. Charpentier*, 332 F.3d 283, 287 (5th Cir. 2003), *cert. denied*, 540 U.S. 1056 (2003) (quoting from *Avondale Shipyards, Inc. v. Kennel*, 914 F.2d 88, 90 (5th Cir. 1990)). The Court may not substitute its judgment for that of the ALJ, reweigh or reappraise the evidence. *Louisiana Ins. Guar. Ass;n,* 211 F.3d at 296. "That the facts may permit diverse inferences is

immaterial.  The Administrative Law Judge alone is charged with the duty of selecting the inference which seems most reasonable and his choice, if supported by the evidence, may not be disturbed." *Presley v. Tinsley Maintenance Serv.*, 529 F.2d 433 (5th Cir. 1976).

"Substantial evidence is that relevant evidence- more than a scintilla but less than a preponderance–that would cause a reasonable person to accept the fact finding."  *Dir. Office of Workers' Compensation Programs, U.S. Dept. of Labor v. Ingalls Shipbuilding, Inc.,* 125 F.3d 303, 305 (5th Cir. 1997).   "Substantial evidence is evidence that a 'reasonable mind might accept as adequate to support a conclusion.'"  *Hall v. Consolidated. Employment Sys., Inc.,* 139 F.3d 1025, 1029 (5th Cir. 1998)(quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)).  "The requirement of substantial evidence 'is less demanding than that of preponderance of the evidence, and the ALJ's decision need not constitute the sole inference that can be drawn from the facts.'"  *Id.*  (quoting *New Thoughts Finishing Co. v. Chilton*, 118 F.3d 1028, 1030 (5th Cir. 1997).

Upon this record, Petitioner has presented no legal basis for overruling the Board's decision. It is not the function or role of the Court, in its review of a Board decision, to reweigh or reappraise the evidence.  Given the case law of the Fifth Circuit Court of Appeals, the Court's review is limited to correcting errors of law and determining whether substantial evidence supports the decision. Applying the applicable case law, the  undersigned finds that substantial evidence supports the Board's decision that Petitioner was not entitled to death benefits under the Act.

Petitioner contends that the Board's decision is not supported by substantial evidence.  Here, upon this record, Petitioner's contentions are without merit.  The record, as a whole, reveals substantial evidence supports the Board's finding that Petitioner was not entitled to benefits. Although Petitioner's expert testified that Decedent's suicide was caused by PTSD, which he

19

developed as a result of his employment in Iraq, the ALJ found his testimony not as persuasive as that proffered by Dr. Brodsky.  Here, neither testifying medical expert had examined decedent.  Even though Dr. Sieberhagen opined that decedent suffered from PTSD directly due to the pressures of his work environment in Iraq, and that this created the "irresistible impulse" which caused him to commit suicide and not by a willful intent to injure himself, this testimony was controverted by that of Dr. Brodsky and other witnesses.  Despite the strain that being in Iraq had on Decedent with respect to his family and friends in Namibia opposed to the United States' involvement in the war, the ALJ, nonetheless, found that while conditions in Iraq were not ideal, Decedent had not been exposed to life threatening or perceived life threatening events or dangers.  Here, the thoroughness of the ALJ's decision shows that he carefully considered the entire record, and that his determination reflects those findings accurately.  There is nothing in the record to suggest that the ALJ made improper credibility findings, or that he weighed the testimony improperly.

Given  the deference owed to credibility determinations made by the ALJ and applying the applicable law concerning the scope of review, Dr. Brodsky's testimony, which was credited by both the Board and the ALJ, provides substantial evidence to support the decision.  To the extent that Plaintiff contends the matter should be remanded so that depression could be considered as a cause of Decedent's suicide, the record shows that depression, among other possible stressors, were considered by Petitioner's own expert, Dr. Sieberhagen but he ultimately opined that the only possible explanation for Decedent's suicide was PTSD.  As such, Dr. Sieberhagen implicitly eliminated depression as a contributing cause of Decedent's suicide and therefore remand is not warranted.  Here, the gist of Petitioner's arguments before the Court are the same as that raised with the Board: re-weigh the evidence.  Weighing the competing evidence and assessing credibility is the province of

the ALJ.  Having reviewed the entire record, there is more than a scintilla of evidence supporting the ALJ's decision, and the ALJ's findings on this record are not irrational.  Even assuming that other inferences and conclusions could have been drawn as argued by Petitioner, because substantial evidence supports the Board's decision, the court must defer to that determination and not replace it with its own.   Because there is more than a scintilla of evidence for a reasonable person to conclude that decedent's suicide was an impulse type action, under § 903(c) claimant was not entitled to benefits.   Given that substantial evidence and the relevant legal standards support the final administrative decision to deny claimant's application for benefits, upon this record, neither the ALJ or the Board misstated or misanalyzed the record. As such, the ALJ's Order and the Board's affirmance of the ALJ's Order should  be affirmed.


**V.  Conclusion**

Considering the record as a whole, the undersigned is of the opinion that the ALJ and the Board properly applied the law, which directs a finding that Petitioner was not entitled to benefits because Decedent had committed suicide, that substantial evidence supports the Board's decision, and that the decision should be affirmed.  As such, the Magistrate Judge RECOMMENDS that that the BRB's decision be AFFIRMED.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record.  Within 10 days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), Fed.R.Civ.P. 72(b), and General Order 80-5, S.D. Texas.  Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir. 1982)

(en banc).  Moreover, absent plain error, failure to file objections within the ten day period bars an aggrieved party from attacking conclusions of law on appeal.  *Douglass v. United Serv. Auto Assn,* 79 F.3d 1415, 1429 (5th Cir. 1996).

Signed at Houston, Texas, this 11th day of March, 2009

Frances H. Stacy
United States Magistrate Judge